Jose Francisco PENA–ROSARIO,
Petitioner/Plaintiff,

v.

Janet RENO, Attorney General of the United States; Doris Meissner, Commissioner, Immigration and Naturalization Service; Edward McElroy, New York District Director, Immigration and Naturalization Service; Immigration and Naturalization Service; United States Department of Justice, Respondents/Defendants.

Efrain Enrique Vargas,
Petitioner/Plaintiff,

v.

Janet Reno, Attorney General of the United States; Doris Meissner, Commissioner, Immigration and Naturalization Service; Edward McElroy, New York District Director, Immigration and Naturalization Service; Immigration and Naturalization Service; United States Department of Justice, Respondents/Defendants.

Neil Robinson, Petitioner/Plaintiff,

v.

Janet Reno, Attorney General of the United States; Doris Meissner, Commissioner, Immigration and Naturalization Service; Lynn Underdown, Louisiana District Director, Immigration and Naturalization Service; Immigration and Naturalization Service; United States Department of Justice, Respondents/Defendants.

Sergio Trinidad, Petitioner/Plaintiff,

v.

Janet Reno, Attorney General of the United States; Doris Meissner, Commissioner, Immigration and Naturalization Service; Edward McElory, New York District Director, Immigration and Naturalization Service; Lynn Underdown, Louisiana District Director, Immigration and Naturalization Service; Immigration and Naturalization Service, Respondents/Defendants.

Bajrush Gjeta, Petitioner/Plaintiff,

v.

Janet Reno, Attorney General of the United States; Doris Meissner, Commissioner, Immigration and Naturalization Service; Edward McElory, New York District Director, Immigration and Naturalization Service; Lynn Underdown, Louisiana District Director, Immigration and Naturalization Service; Immigration and Naturalization Service, Respondents/Defendants.

Nos. 99–CV–4652 (JG), 99–CV–6193 (JG), 99–CV–7054 (JG), 99–CV–7114 (JG), 99–CV–7630 (JG).

United States District Court, E.D. New York.

Feb. 8, 2000.

Alan Michael Strauss, Bretz & Coven, New York City, for petitioners, Pena–Rosario and Vargas.

Neil Robinson, Oakdale, LA, petitioner pro se.

Sergio Trinidad, Oakdale, LA, petitioner pro se.

Bajrush Gjeta, F.D.C.—Oakdale, Oakdale, LA, petitioner pro se.

Loretta Lynch, United States Attorney, Eastern District of New York, Brooklyn, New York, by Mary Elizabeth Delli–Pizzi, Assistant United States Attorney, for respondents.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

These five habeas corpus petitions are brought by aliens challenging final orders of removal. They each contend that statutory changes from 1996 rendering certain convicted felons ineligible for discretionary waivers of deportation do not apply to them since their criminal conduct took place before enactment of those statutes.

The government challenges the court's subject matter jurisdiction over these cases.

I conclude that I have subject matter jurisdiction pursuant to the habeas statute, 28 U.S.C. § 2241. In addition, I conclude that the statutory changes do not apply to these petitioners and therefore grant each of them writs of habeas corpus and order that their removal orders be vacated so that they may apply for discretionary waivers.

## BACKGROUND

### A. José Francisco Pena–Rosario

José Francisco Pena–Rosario entered the United States as a lawful permanent resident on November 2, 1979. He was eight years old at the time. (Declaration of Assistant United States Attorney Scott Dunn ("Dunn/Pena–Rosario Declaration"), ¶ 3; Verified Petition for a Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief ("Pena–Rosario Complaint"), ¶ 12.)

On August 3, 1993, Pena–Rosario was convicted of attempted criminal sale of a controlled substance and sentenced to one to three years in prison. On September 20, 1993, he was again convicted of attempted criminal sale of a controlled substance and sentenced to one to three years, to be served concurrently with the August 3 conviction. (Dunn/Pena–Rosario Declaration, ¶ 4.)

On August 5, 1994, the Immigration and Naturalization Service ("INS") served an order to show cause on Pena–Rosario charging him with being deportable pursuant to Section 241(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1251(a)(2)(A)(iii) (1994), for being an alien convicted of an aggravated felony. Unbeknownst to Pena–Rosario, however, the INS did not file the order to show cause with the immigration court. (Dunn/Pena–Rosario Declaration, ¶ 5; Pena–Rosario Complaint, ¶ 15.) On November 7, 1995, Pena–Rosario completed an applica-

tion for a waiver of deportation pursuant to INA § 212(c), 8 U.S.C. § 1182(c) (1994), and proffered the required payment. The immigration court would not accept the application because the INS had not yet filed the order to show cause with the court. (Pena–Rosario Complaint, ¶ 16.)

On June 19, 1997, the INS issued a notice to appear to Pena–Rosario, charging him with being removable pursuant to INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii) (Supp. III 1997), for being an alien who had committed an aggravated felony and INA § 237(a)(2)(B)(i), 8 U.S.C. § 1227(a)(2)(B)(i) (Supp. III 1997), for being an alien convicted of a drug-related offense. (Dunn/Pena–Rosario Declaration, ¶ 6; Pena–Rosario Complaint ¶ 22.)

At a removal hearing on December 9, 1997, Pena–Rosario conceded his deportability but sought a discretionary waiver. The Immigration Judge, however, ruled that 1996 changes to the immigration laws had made Pena–Rosario statutorily ineligible for a waiver of inadmissibility under INA § 212(c) and therefore ordered him removed to the Dominican Republic. The Board of Immigration Appeals dismissed Pena–Rosario's appeal on April 5, 1999, finding that the immigration judge had correctly determined that Pena–Rosario was not eligible for discretionary relief. (Dunn/Pena–Rosario Declaration, ¶ 7, 8; Pena–Rosario Complaint ¶ 23–25.)

Pena–Rosario filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 on August 9, 1999.

## B. *Efrain Enrique Vargas*

Efrain Enrique Vargas, a native of the Dominican Republic, entered the United States as a lawful permanent resident on October 3, 1986. (Declaration of Assistant United States Attorney Mary Elizabeth Delli–Pizzi ("Delli–Pizzi/Vargas Declaration"), ¶ 3; Verified Petition for a Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief ("Vargas Complaint"), ¶ 11.) On June 4, 1996 he was

convicted after guilty plea of immigration fraud, 18 U.S.C. § 1546, and identification document fraud, 18 U.S.C. § 1028, in the United States District Court for the Southern District of New York. (Delli–Pizzi/Vargas Declaration, ¶ 4; Vargas Complaint ¶ 15.) The convictions rested on Vargas's conduct from June 1992 to June 1994, when he was paid to prepare and submit false documents to the INS for individuals trying to obtain work authorization papers. (Vargas Complaint ¶ 12.)

The INS issued Vargas a notice to appear on April 1, 1997 and placed him in removal proceedings for having committed an aggravated felony, *see* INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii) (Supp. III 1997). (Delli–Pizzi/Vargas Declaration, ¶ 5; Vargas Complaint, ¶ 20.) On May 5, 1997, the INS also charged Vargas with being deportable on the independent basis that his conviction was for immigration fraud, *see id.* § 241(a)(3)(B)(iii), 8 U.S.C. § 1227(a)(3)(B)(iii) (Supp. III 1997) (alien convicted of immigration fraud pursuant to 18 U.S.C. § 1546 deportable). (Exhibit C to Delli–Pizzi/Vargas Declaration; Vargas Complaint ¶ 21.) On July 8, 1997, Vargas posted a $6,000 bond and was released from INS custody. (Delli–Pizzi Declaration, ¶ 6.)

In a hearing before an Immigration Judge on February 6, 1998, Vargas sought a discretionary waiver of removal, but the judge found that he was ineligible and ordered him removed to the Dominican Republic. (Delli–Pizzi/Vargas Declaration, ¶ 8; Vargas Complaint, ¶ 23.) On June 24, 1999, the Board of Immigration Appeals dismissed Vargas's appeal, also concluding he was statutorily ineligible for the relief he sought. (Delli–Pizzi/Vargas Declaration, ¶ 9; Vargas Complaint ¶ 25.)

Vargas filed his habeas petition in this court on October 1, 1999.

## C. *Neil Robinson*

Neil Robinson, a citizen of Jamaica, entered the United States as an immigrant

on December 20, 1987. (Declaration of Special Assistant United States Attorney Patrick Shen ("Shen Declaration"), ¶ 3.) On October 14, 1992, he was convicted of attempted robbery in the first degree in the Supreme Court of the State of New York, County of Bronx. He was sentenced to a prison term of two-and-one-half to five years. (*Id.*, ¶ 4.)

On October 23, 1998, the INS initiated removal proceedings against Robinson by issuing a notice to appear charging him with being removable pursuant to INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii) (Supp. III 1997), for having committed an aggravated felony. On May 18, 1999, an Immigration Judge in Oakdale, Louisiana, where Robinson is detained, issued a removal order against him. (*Id.*, ¶ 6.) The Board of Immigration Appeals, which held that Robinson, as an aggravated felon, was ineligible to apply for a discretionary waiver, dismissed Robinson's appeal of the removal order on September 16, 1999. (*Id.*, ¶ 7.)

Robinson filed his habeas petition in this court on October 29, 1999.

## D. *Sergio Trinidad*

Sergio Trinidad, a native of the Dominican Republic, entered the United States as a lawful permanent resident on April 3, 1987. (Declaration of Assistant United States Attorney Scott Dunn ("Dunn/Trinidad Declaration"), ¶ 3.) On October 24, 1989, he was indicted in the Supreme Court of the State of New York, County of the Bronx, for criminal sale of a controlled substance. (*Id.*, Exhibit B.) He was convicted of the offense on January 26, 1999. (*Id.*, ¶ 4.) (The record does not explain the lengthy lapse of time between indictment and conviction.)

The INS placed Trinidad in removal proceedings on March 24, 1999, charging him with being deportable both for having committed an aggravated felony and a drug offense. (*Id.*, ¶ 5.) On July 13, 1999, the Immigration Judge found that Trinidad was not eligible for relief and ordered

him removed to the Dominican Republic. (*Id.*, ¶ 6.) On November 1, 1999, the Board of Immigration Appeals dismissed Trinidad's appeal, finding that the removal proceeding suffered from no due process defects, that he was not hampered by his inability to speak English, and that he was statutorily ineligible for a discretionary waiver of deportation. (*Id.*, Exhibit E.)

Trinidad filed his habeas petition in this Court on November 1, 1999.

## E. *Bajrush Gjeta*

Bajrush Gjeta, a native and citizen of Albania, was admitted to the United States as a refugee on November 26, 1990. (Declaration of Assistant United States Attorney Mary Elizabeth Delli–Pizzi. ("Delli-Pizzi/Gjeta Declaration"), ¶ 3.) On an unspecified date, his status was adjusted to lawful permanent resident. (*Id.*)

On or about November 21, 1996, Gjeta was convicted in the United States District Court for the District of Massachusetts of conspiracy to distribute heroin and possession with intent to distribute heroin. (*Id.*, ¶ 4.) Gjeta's judgment specifies that his offense conduct concluded on December 8, 1995. (*Id.*, Exhibit B.)

On March 9, 1998, the INS issued Gjeta a notice to appear initiating removal proceedings against him by reason of his having committed an aggravated felony. (*Id.*, ¶ 5.) On June 24, 1998, an immigration judge denied Gjeta's application for political asylum, withholding of deportation, and relief under Article III of the Torture Convention. (*Id.*, ¶ 6–7.) After an appeal, a remand to the immigration judge, another adverse decision, and a second appeal, the Board of Immigration Appeals on December 7, 1999, dismissed Gjeta's appeal, finding him ineligible for the relief he sought. (*Id.*, ¶ 8–11.)

In his petition for a writ of habeas corpus, received in this court on November 17, 1999, Gjeta argues only that he should be able to apply for a discretionary waiver

of deportation pursuant to INA § 212(c). He does not press his asylum or torture claims.

### F. *The Issues Raised*

Each petitioner contends that (i) application of the 1996 restrictions on discretionary waivers to him would be impermissibly retroactive because his criminal conduct (upon which the order of removal is based) took place prior to the statutory changes, *see Landgraf v. U.S.I. Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994);[1] and (ii) denying him the ability to seek a discretionary waiver would violate the Equal Protection Clause, since criminal aliens in deportation or exclusion proceedings are still allowed to seek a waiver, while those in removal proceedings, like petitioners here, are not.

The government challenges the court's subject matter jurisdiction over these petitions, and, in Robinson's case, personal jurisdiction. In the event that jurisdiction is found, the government contends that the 1996 amendments to the INA do apply to these petitioners, thus rendering them ineligible for discretionary waivers, and that such ineligibility presents no constitutional infirmity.

### *DISCUSSION*

### A. *Statutory Framework*

Before discussing the complex jurisdictional issues presented by this case, it will be helpful to briefly sketch the statutory framework governing both discretionary waivers of deportation and judicial review and note how it was altered in 1996.

#### 1. *Immigration and Naturalization Act of 1961*

##### a. *Deportation and Discretionary Waivers*

Under § 241 of the old INA, 8 U.S.C. § 1251 (1994), an alien could be deported for having committed, *inter alia,* a crime of "moral turpitude," an "aggravated felony," or a drug offense. The Attorney General had discretion to waive deportation of such aliens who had an unrelinquished domicile in the United States for at least seven years, unless the alien was deportable because of an aggravated felony for which he served five years in prison.[2] *See* old INA § 242(c), 8 U.S.C. § 1182(c) (1994).

##### b. *Judicial Review*

Under the INA, a criminal alien who faced an order of deportation or exclusion could seek judicial review in the court of appeals, pursuant to the Hobbs Act, which allows for review of agency actions. *See* old INA § 106, 8 U.S.C. § 1105a(a) (1994) (cross-referencing 28 U.S.C. §§ 2341–2351). Petitions for review were to be filed within 30 days of the final deportation order in the circuit court where the administrative proceedings took place or where the petitioner resided. *See id.,* 8 U.S.C. § 1105a(a)(1)–(2). The review available in this proceeding was comparable to that conducted for other agency actions under the Administrative Procedure Act. *See Henderson v. INS,* 157 F.3d 106, 117 (2d Cir.1998), *cert. denied,* 526 U.S. 1004, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999).

**1.** Because the INS served Pena–Rosario with an order to show cause before the enactment of the 1996 amendments to the INA that deprive the Attorney General of her discretion to waive deportation for aliens in his position, he additionally argues that those changes should not apply to him pursuant to the rule of *Henderson v. INS,* 157 F.3d 106, 129–30 (2d Cir.1998), *cert. denied,* 526 U.S. 1004, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999).

**2.** On its face, the waiver provision applied only to those permanent residents who went abroad and then were put in exclusion proceedings upon their return. The courts held that allowing this group of permanent residents to seek a discretionary waiver while denying such relief to those being deported was irrational and violated equal protection. *See, e.g., Francis v. INS,* 532 F.2d 268, 273 (2d Cir.1976). Permanent residents facing deportation could therefore apply for a discretionary waiver pursuant to § 212(c). *See Id.*

Although the INA specified that this court of appeals review was to be the "sole and exclusive procedure" for judicial review of final orders of deportation, old INA § 106, 8 U.S.C. § 1105a(a), it also provided that "any alien held in custody pursuant to an order of deportation may obtain judicial review thereof by habeas corpus proceedings," *id.*, 8 U.S.C. § 1105a(a)(10). Although it was unclear how exactly this habeas provision fit in to the overall statutory scheme, which evinced a clear purpose to consolidate judicial review of a deportation order in one court of appeals proceeding, "[t]he best view is that the [habeas] provision was intended to be limited to situations in which the alien was unable to obtain judicial review under the new statutory procedure." *LaGuerre v. Reno,* 164 F.3d 1035, 1038 (7th Cir.1998), *petition for cert. filed,* 68 U.S.L.W. 3154 (U.S. Sept. 7, 1999) (No. 99–418).

### 2. *AEDPA*

On April 24, 1996, President Clinton signed the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) ("AEDPA"), which made changes to the INA regarding deportability and judicial review.

#### a. *Deportation and Discretionary Waivers*

AEDPA expanded the range of criminal offenses that could render an alien deportable.[3] It also specified that discretionary waivers would no longer be available for those aliens deportable by reason of having committed, *inter alia,* an aggravated felony or a drug offense. *See* AEDPA § 440(d) (amending old INA § 212(c), 8 U.S.C. § 1182(c)).

#### b. *Judicial Review*

AEDPA deleted INA § 1105a(a)(10) (the INA habeas provision) and replaced it with the following language:

> Any final order of deportation against an alien who is deportable by reason of having committed a criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i), shall not be subject to review by any court.

AEDPA § 440(a). The Second Circuit deemed this a jurisdiction-stripping provision that took effect immediately upon AEDPA's enactment, thus requiring the dismissal of a petition for review by a criminal alien pending in the Court of Appeals. *See Hincapie–Nieto v. INS,* 92 F.3d 27, 29–30 (2d Cir.1996).[4]

### 3. *The Immigration Reform Act*

The above statutory scheme was short-lived; Congress amended it again as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which was enacted on September 30, 1996.

---

**3.** Previously, an alien could be deported only upon committing a crime of "moral turpitude" that led to an actual sentence of one year or more. Old INA § 241(a)(2)(A)(i)(II), 8 U.S.C. § 1251(a)(2)(A)(i)(II) (1994). AEDPA made deportable any alien who committed a crime of moral turpitude that carried a *possible* sentence of one year or more. AEDPA § 435(a). The statute specified that this change "shall apply to aliens against whom deportation proceedings are initiated after the date of the enactment of this Act." *Id.* § 435(b).

AEDPA also amended the definition section of the old INA to expand the list of "aggravat-ed felon[ies]" that rendered an alien deportable. *Id.* § 440(e) (amending old INA § 101(a)(43), 8 U.S.C. § 1101(a)(43)). With one exception, AEDPA specified that the expanded definition of aggravated felony would apply "to convictions entered on or after the date of the enactment of this Act." *Id.* § 440(f).

**4.** As discussed below, this holding depended on the remaining availability of some form of habeas corpus review in the district court. *See Hincapie–Nieto,* 92 F.3d at 31.

### a. Deportation and Discretionary Waivers

IIRIRA deleted § 212(c) of the old INA, 8 U.S.C. § 1182(c), which (as amended by AEDPA) had governed the Attorney General's discretion to waive deportation for certain permanent residents. *See* IIRIRA § 304(b). In its place, IIRIRA inserted a new provision entitled "Cancellation of removal." IIRIRA § 304(a), new INA § 240A, 8 U.S.C. § 1229b (Supp. III 1997). This provision authorizes the Attorney General to cancel removal (the new term encompassing both deportation and exclusion) for any alien who meets three requirements: permanent resident status for at least five years; continuous residence in the United States for seven years; and having not committed an aggravated felony. *See id.* IIRIRA also further expanded the list of offenses that qualify as "aggravated felonies." *Id.* § 321(a) (amending INA § 101(a)(43), 8 U.S.C. § 1101(a)(43)).

### b. Judicial Review

Upon enactment of IIRIRA, there co-existed three different judicial review regimes, application of which depended on the timing of a given removal proceeding. Any removal order that became administratively final before October 30, 1996, was (with one exception [5]) not affected by IIRIRA; it was subject to the judicial review provisions of the INA, as amended by AEDPA. Removal orders becoming administratively final after October 30, 1996, were divided into two groups. Those that were the result of removal proceedings initiated before April 1, 1997, were to be governed by a set of transitional rules. Those initiated on or after April 1, 1997 were to be governed by IIRIRA's permanent rules. There is ample Second Circuit case law addressing the transitional rules, but none regarding the permanent rules, which are at issue in this case.

**5.** As discussed below, Congress directed that § 242(g) of the Reform Act, 8 U.S.C.

### (i) The Transitional Rules

The transitional rules included a successor to AEDPA § 440(a); it said, "there shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed a criminal offense [listed in ¦ the statute]." § 309(c)(4)(G). In addition, Congress directed that one provision from the permanent rules apply to *all* cases, including those governed by the transitional rules:

> Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

*Id.,* § 242(g), 8 U.S.C. § 1252(g) (Supp. III 1997); *see also* IIRIRA § 306(c)(1) (requiring that § 242(g) "apply without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings").

The lower courts, including the Second Circuit, originally interpreted § 242(g) as a broad jurisdiction-stripping provision. *See, e.g., Henderson,* 157 F.3d at 117 n. 7 (referring to this as a "catch-all provision"); *Jean–Baptiste v. Reno,* 144 F.3d 212, 218 (2d Cir.1998). However, the Supreme Court in *Reno v. American–Arab Anti–Discrimination Comm.,* 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999), adopted a much narrower construction of § 242(g), holding that it barred review of only the "three discrete events" there enumerated: commencement of proceedings, "adjudicat[ion]" of cases, and "execut[ion]" of removal orders. *See id.* at 943.

Other than these changes, the INA review structure, with its contemplation of direct review in the courts of appeals, remained in place during the IIRIRA transitional period.

§ 1252(g) (Supp. III 1997), a permanent provision, be applied in all cases.

This mongrel regime created by the INA, AEDPA, and IIRIRA's transitional rules has been twice construed by the Second Circuit. In *Jean–Baptiste,* 144 F.3d 212, three permanent residents convicted of drug crimes challenged final deportation orders on due process grounds, contending that the Government should be obligated to inform permanent residents that certain criminal convictions could lead to their deportation. *See id.* at 214. The three sought to enjoin the Attorney General from enforcing the deportation orders. *See id.*

The Second Circuit, in an opinion written by Judge Cardamone, concluded that IIRIRA § 242(g) deprived the court of jurisdiction over the case and that it consequently had to be dismissed. *See id.* at 218. The court found no "constitutional infirmity" in the jurisdiction-stripping provisions of AEDPA or applicable portions of IIRIRA, however, because it concluded that review by way of habeas corpus remained available. *See id.* Noting the Supreme Court's rule that a statute may not generally repeal habeas corpus jurisdiction by implication, the court found no express repeal of general habeas corpus jurisdiction in AEDPA or IIRIRA and concluded that it therefore survived. *See id.* at 219 (citing 28 U.S.C. § 2241 & *Felker v. Turpin,* 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996)). At the least, habeas review remained available to review constitutional claims, but the court "express[ed] no opinion on the permissible scope of that review." *Id.* at 220.

Since the plaintiffs in *Jean–Baptiste* had sought the district court's jurisdiction under 28 U.S.C. § 1331, the general federal question jurisdiction statute, not 28 U.S.C. § 2241, the provision governing habeas corpus jurisdiction, the Circuit concluded that the federal courts were without jurisdiction to entertain their claim. *See id.*

Four months later, the Circuit began to answer the question left open in *Jean–Baptiste* about the scope of review available under 28 U.S.C. § 2241. The case,

*Henderson,* 157 F.3d 106, involved four legal permanent residents, all of whom faced deportation orders for having been convicted of criminal offenses. Each was seeking a discretionary waiver of deportation when Congress passed AEDPA, which deprived the Attorney General of this discretionary power. The Attorney General took the position that this change applied retrospectively even to deportation proceedings pending upon the date of the statute's enactment; the INS therefore denied the four relief. *See id.* at 109–112. Each of them filed habeas petitions in the district court; three of them also filed petitions for direct review in the Court of Appeals. *See id.*

Rejecting the government's contention that the scope of habeas review was limited to "substantial" constitutional claims and did not extend to questions of statutory construction, the court, in an opinion written by Judge Calabresi, held that "whatever the outer perimeters of such review may be, the courts have the power to address the pure questions of law presented in the instant cases." *Id.* at 112, 119; *see also id.* at 119 (agreeing with the government, however, that the scope of habeas review is "considerably narrower" than that available before the 1996 legislation). At the same time, however, the court indicated that it was "strongly inclined" to support the government's other principal argument—that review (to the extent it was available) should occur by means of a petition for review in the court of appeals instead of a habeas petition in the district court. *See id.* at 119 n. 9. Such a result would be faithful to Congress's intent to streamline the removal process, while allowing habeas review actually *added* a layer of review not available prior to 1996. Moreover, the courts of appeals are accustomed to reviewing agency actions; such review can be implied under certain circumstances to avoid constitutional problems; and allowing for such review (so long as it was co-extensive with that available under the habeas statute) would obvi-

ate the need for habeas petitions. *See id.* (citing *Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); *Swain v. Pressley,* 430 U.S. 372, 381, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977)). Nonetheless, the *Henderson* panel was not writing on a "clean slate"; it was bound by *Jean–Baptiste* to reject the government's argument and uphold habeas jurisdiction over such cases in the district courts. *See id.* at 109 n. 2, 119.

On the merits, the Court read AEDPA as reflecting Congressional intent not to apply to pending cases the provision stripping the Attorney General of jurisdiction to grant discretionary waivers to criminal aliens. *See id.* at 130. Since the court decided the case on this basis, it found it unnecessary to reach the broader question of whether the changes should apply to permanent residents whose criminal conduct or convictions providing the basis for an order of removal took place before enactment of AEDPA. *See id.* at 128 n. 28.

Five months after issuance of *Henderson,* the *Jean–Baptiste* panel denied the government's motion for rehearing, which had urged the court to revise the portion of *Jean–Baptiste* that found habeas review available in the district court. *See Jean–Baptiste v. Reno,* 175 F.3d 226, 227 (2d Cir.1999) (*per curiam*). The panel noted *Henderson*'s criticism, but cited opinions from other circuits that followed the habeas approach and adhered to its prior decision. *See id.*

Nine circuit courts have taken the same route as *Jean–Baptiste* and concluded that district court jurisdiction under 28 U.S.C. § 2241 survived AEDPA and the IIRIRA transitional rules. *See Goncalves v. Reno,* 144 F.3d 110, 113 (1st Cir.1998), *cert. denied,* 526 U.S. 1004, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999); *Sandoval v. Reno,* 166 F.3d 225, 231 (3d Cir.1999); *Bowrin v. INS,* 194 F.3d 483, 485 (4th Cir.1999) (*per curiam*); *Requena–Rodriguez v. Pasquarell,* 190 F.3d 299, 305 (5th Cir.1999); *Pak v. Reno,* 196 F.3d 666, 673 (6th Cir.1999); *Shah v. Reno,* 184 F.3d 719, 724 (8th Cir.

1999); *Magana–Pizano v. INS,* 200 F.3d 603, 608–09 (9th Cir.1999); *Jurado–Gutierrez v. Greene,* 190 F.3d 1135, 1140 (10th Cir.1999); *Mayers v. INS,* 175 F.3d 1289, 1301 (11th Cir.1999). *But see LaGuerre v. Reno,* 164 F.3d 1035, 1040 (7th Cir.1998) (holding that § 2241 jurisdiction did not survive AEDPA but that some direct review of constitutional claims remains available in the court of appeals), *petition for cert. filed,* 68 U.S.L.W. 3154 (U.S. Sept. 7, 1999) (No. 99–418).

### (ii) *The Permanent Rules*

IIRIRA's permanent provisions delete entirely the INA's judicial review provision (as amended by AEDPA) and insert a new judicial review scheme in its place. *See* IIRIRA § 306(b) (deleting old INA § 106, 8 U.S.C. § 1105a (1994)); *id.* § 306(b) (inserting new INA § 242, 8 U.S.C. § 1252 (Supp. III 1997)).

At its core, the new judicial review provision is equivalent to the one it superseded in the INA: it directs that judicial review of orders of removal be conducted in the courts of appeals in the manner those courts typically review agency actions. *See* INA § 242(a)(1), 8 U.S.C. § 1252(a)(1) (cross-referencing 28 U.S.C. §§ 2341–2351). Consistent with AEDPA and the IIRIRA interim rules, the permanent rules also include a provision excepting appeals by certain criminal aliens from this judicial review scheme: "Notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed [an enumerated] criminal offense." *Id.* § 242(a)(2)(C), 8 U.S.C. § 1252(a)(2)(C); *see Henderson,* 157 F.3d at 117 n. 7 (calling this provision the "successor" to AEDPA § 440(a) and IIRIRA transitional rule § 309(c)(4)(G)) (dictum).

The permanent rules also feature new INA § 242(g), 8 U.S.C. § 1252(g), the subject of the Supreme Court's opinion in *American–Arab Anti–Discrimination*

*Comm.*, 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940, discussed previously.[6]

Finally, among the "requirements" for petitions for review filed in the courts of appeals pursuant to § 242 is the following:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

INA § 242(b)(9) (as amended), 8 U.S.C. § 1252(b)(9) (Supp. III 1997). In dicta, the Supreme Court has referred to this provision as an "unmistakable 'zipper clause,'" one that "covers the universe of deportation claims." *American–Arab*, 119 S.Ct. at 943 (contrasting the provision with § 242(g), which it found to have a much more narrow scope).

As of now, there is no Second Circuit opinion addressing the existence or scope of judicial review under the permanent rules. The only circuit court to decide this question is the Eleventh Circuit in *Richardson v. Reno*, 180 F.3d 1311 (11th Cir. 1999) (*Richardson II*), petition for cert. filed, 68 U.S.L.W. 3367 (U.S. Nov. 23, 1999) (No. 99–887).

In 1998, the same panel had held that the IIRIRA permanent provisions ended district court jurisdiction under 28 U.S.C. § 2241. *See Richardson v. Reno*, 162 F.3d 1338 (11th Cir.1998) (*Richardson I*). That decision was based in part on reading § 242(g) as a broad jurisdiction-stripping provision. In light of the Supreme Court's subsequent opinion in *American–Arab*, which significantly narrowed the scope of § 242(g), the Supreme Court granted certiorari in *Richardson I*, vacated the judgment, and remanded the case to the Elev-

enth Circuit for reconsideration in light of *American–Arab*. *See Richardson v. Reno*, 526 U.S. 1142, 119 S.Ct. 2016, 143 L.Ed.2d 1029 (1999).

On remand, the Eleventh Circuit adhered to its previous decision, but disclaimed any reliance on § 242(g). At the outset, the court noted that the large body of circuit case law supporting habeas jurisdiction in the district courts, including the Eleventh Circuit's own case of *Mayers v. INS*, 175 F.3d 1289 (11th Cir.1999), was decided under the IIRIRA transitional rules and was therefore not directly applicable to a permanent rule case. *See Richardson II*, 180 F.3d at 1313 n. 2; *see also id.* at 1316 n. 6. In support of its position that IIRIRA's permanent provisions ended habeas jurisdiction, the court cited AEDPA's repeal of INA § 106(a)(10), the former habeas provision; IIRIRA's designation of the court of appeals as the venue for judicial review of removal orders; and, most importantly, § 242(b)(9)'s directive that review of "all questions of law and fact" be consolidated in one proceeding in the court of appeals. *See id.* at 1314–15.

**B. Subject Matter Jurisdiction**

*1. Pena–Rosario*

■ I conclude that the IIRIRA's transitional rules govern Pena–Rosario's case, and that I therefore have jurisdiction to entertain his habeas petition pursuant to the holding of *Henderson*, 157 F.3d at 112, 119. My conclusion rests on the fact that the INS served Pena–Rosario with an order to show cause on August 5, 1994

The permanent provisions of IIRIRA do not apply to "an alien who is in exclusion or deportation proceedings" before April 1, 1997. IIRIRA, § 309(c)(1). Those aliens are subject to IIRIRA's transitional rules. *Id.* § 309(c)(4). A key question is there-

---

**6.** There is some disagreement in the courts about whether § 242(g), as construed by the Supreme Court, has any relevance to a challenge to a final order of deportation. *See Requena–Rodriguez*, 190 F.3d at 303 & n. 11 (canvassing cases coming to different results regarding whether petition challenging final order of deportation is challenge to the execution of a removal order and therefore covered by § 242(g)).

fore whether service of the order to show cause on Pena–Rosario, even though no notice to appear was filed in the immigration court, put him "in ... deportation proceedings" for purposes of triggering the transitional rules.

The Eleventh Circuit has recently answered this question in the affirmative, *see Alanis–Bustamante v. Reno*, 201 F.3d, 1303, 1309–10 (11th Cir.2000), and I agree with its analysis. "To conclude otherwise not only risks undermining the reasonable expectations of an alien, it also ignores INS' power over an alien once it issues an order to show cause. As soon as the INS issued the order to show cause, it had the authority to arrest [Pena–Rosario]." *Id.*[7]

Also relevant to this inquiry are cases in which courts have concluded that service of an order to show cause renders a deportation proceeding "pending" for purposes of determining whether IIRIRA substantive changes to the law of discretionary waivers apply or not. I will leave discussion of those cases to the portion of this opinion devoted to that question. *See infra* § D(1).

### 2. *All Petitioners*

▮ I conclude that district courts retain jurisdiction under 28 U.S.C. § 2241 to hear the claims of the remaining petitioners, who are subject to IIRIRA's permanent judicial review provisions.[8]

The starting point for this analysis is the clear dictate of *Jean–Baptiste* and *Henderson*: " 'in the absence of language affirmatively and clearly eliminating habeas review, we presume Congress did not aim to bar federal courts' habeas jurisdic-

tion pursuant to § 2241.' " *Henderson*, 157 F.3d at 118–19 (quoting *Jean–Baptiste*, 144 F.3d at 219). There is nothing in IIRIRA that explicitly strips the district courts of their jurisdiction under 28 U.S.C. § 2241; it is not even mentioned.

Much of the Eleventh Circuit's analysis in *Richardson II* is inapplicable because it conflicts with *Jean–Baptiste* and *Henderson*. This conflict cannot be brushed off by pointing to the fact that the latter two cases addressed the transitional rules, not the permanent ones, for the cases were largely decided on provisions common under both regimes. For example, *Richardson II* cited AEDPA's repeal of the INA's habeas provision in support of its conclusion that district court jurisdiction pursuant to 28 U.S.C. § 2241 did not survive the 1996 amendments. *See Richardson II*, 180 F.3d at 1314. The Second Circuit came to the opposite conclusion about the same provision. *See Henderson*, 157 F.3d at 118–19; *Jean–Baptiste*, 144 F.3d at 218–20. *Richardson II* also relied on the fact that " 'INA § 242(b)(2) provides that the venue for judicial review is only in the court of appeals.' " *Richardson II*, 180 F.3d at 1314 (quoting *Richardson I*, 162 F.3d at 1354). Given the deletion of the INA's habeas provision, the IIRIRA transitional rules also clearly evince an intent to conduct all judicial review in the courts of appeals. However, "the panel in *Jean–Baptiste* considered and rejected the contention that the 1996 laws channel all claims through the courts of appeals." *Henderson*, 157 F.3d at 119 (citing *Jean–Baptiste*, 144 F.3d at 218).

The only provision relied upon by *Richardson II* that is unique to the IIRIRA

---

7. The Eleventh Circuit also relied on the fact that the INS had issued a warrant of detainer in its case and said that it did not have to decide whether the order to show cause alone sufficed to trigger the transitional rules. *See id.* As the language quoted in the text demonstrates, however, I conclude that the order to show cause was the key to the court's analysis and that it would come to the same result in a

case such as this one, in which there is no warrant of detainer.

8. Should my determination that Pena–Rosario's petition was "pending" as of August 5, 1994 be reversed on appeal, the permanent provisions would govern his case. The analysis in this section would then apply to his case as well.

permanent rules is § 242(b)(9), which specifies that

> [j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

§ 242(b)(9), 8 U.S.C. § 1252(b)(9).

The panel in *Richardson II* saw this provision as "clear evidence" of Congress's intent to have all judicial review (to the extent it was available) be conducted at "one place and one time: only in the court of appeals and only after a final removal order."· *Richardson II*, 180 F.3d at 1314. Buttressing that position is the Supreme Court's dictum in *American–Arab*, referring to this provision as an "unmistakable 'zipper clause'" that "covers the universe of deportation claims." *American–Arab*, 119 S.Ct. at 943.

The Second Circuit in *Henderson* was careful to point out that its reliance on habeas jurisdiction pursuant to § 2241 was necessary only because "the immigration laws [had] been interpreted to bar other forms of judicial review." *Henderson*, 157 F.3d at 122 n. 15; *see also id.* at 119 n. 9 ("[W]ere we to hold that direct review was available, so long as the review that remained was the equivalent of habeas, we would avoid all constitutional difficulties associated with a repeal of habeas."). There would be a great deal of appeal in having claims such as those brought by petitioners here adjudicated in the first instance in the court of appeals. They present pure questions of law; Congress clearly wants to expedite review over such cases; and it seems anomalous to afford these petitioners a double layer of review that would have been unavailable to them prior to the 1996 amendments and that remains unavailable to those being removed for other reasons. *See Henderson,*

157 F.3d at 119 n. 9; *LaGuerre*, 164 F.3d at 1039–40.

It is not at all clear, however, by what means such direct review over statutory claims such as these could be had in the court of appeals. *See generally Goncalves*, 144 F.3d at 119 (discussing difficulty in finding basis other than § 2241 for judicial review of questions of statutory construction). IIRIRA does not provide for such direct review; in fact, it forbids it. The habeas statute, 28 U.S.C. § 2241, specifies that the writ may be granted by "any circuit judge," not by a court of appeals generally, and Federal Rule of Appellate Procedure 22(a) states that any habeas petition made to a circuit judge "must be transferred to the appropriate district court." *See Olaguez–Garcia v. INS*, 152 F.3d 1005 (7th Cir.1998) (Ripple, *C.J.*, in chambers) (habeas petition directed to individual circuit judge transferred to district court pursuant to Fed.R.App.P. 22(a)); *see also* 17A Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure* § 4268.1, at 488 (2d ed.1988). The implied power of judicial review enunciated in *Webster v. Doe*, 486 U.S. 592, 601–04, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), might provide a solution, but it is limited to "colorable constitutional claim[s]." The Second Circuit has said that repeal of habeas would be free of "constitutional difficulties" only if an alternative means of review were "equivalent" to habeas jurisdiction, and habeas jurisdiction extends to review of the Attorney General's "interpretation of the immigration laws," not merely to constitutional claims. *Henderson*, 157 F.3d at 119 n. 9, 120.

The barriers to channeling statutory claims such as those raised by these petitioners directly to the court of appeals (and thus making habeas jurisdiction in the district court unnecessary) may be surmountable. But they have not been surmounted yet, and it is for the Second Circuit (if it is so inclined), not for this district court, to take on that task. *See*

*Cuevas v. INS,* No. 99–CV–0048, 1999 WL 1270613, at *6 (N.D.N.Y. Dec.29, 1999) (reluctantly finding habeas jurisdiction over such cases and stating that "[a]ny contrary result must come from the Second Circuit if and when it next revisits this issue"). Accordingly, there is presently no means for these petitioners to obtain judicial review of their claims other than by means of a habeas petition in this court. Accordingly, the Government's motions to dismiss for lack of subject matter jurisdiction are denied.

## C. *Personal Jurisdiction*

Robinson has named Attorney General Janet Reno, INS Commissioner Doris Meissner, the Department of Justice, and INS Louisiana District Director Lynn Underdown as respondents. The Government argues that the first three parties are not proper respondents in a habeas action and that there is no personal jurisdiction over Underdown, the sole proper defendant.[9]

The government raised the same objections in *Henderson* as to two of the petitioners in that consolidated appeal. The Second Circuit called the question of whether the Attorney General could be a proper respondent in such a case "highly complex" and opted against deciding it. *Henderson,* 157 F.3d at 124. Instead, it certified to the New York Court of Appeals the question whether personal jurisdiction over the INS's Louisiana district director could be established pursuant to New York's long-arm statute. *See id.* at 123–24.

The New York Court of Appeals declined to answer the question. *See Yesil v. Reno,* 92 N.Y.2d 455, 682 N.Y.S.2d 663, 705 N.E.2d 655 (1998) (*per curiam* ). It noted that it was unnecessary to address the issue because "[a]lternative possibilities for obtaining jurisdiction, flowing from other potential Federal and State sources, seem far-reaching" and because the issue was unlikely to ever arise in state court. *Id.* at 457, 682 N.Y.S.2d 663, 705 N.E.2d 655. Subsequently, the parties settled, so the Second Circuit found it unnecessary to return to the question. *See Yesil v. Reno,* 175 F.3d 287, 288–89 (2d Cir.1999) (*per curiam* ).

■ Against this unenlightening backdrop, I address the question of personal jurisdiction in Robinson's case. There would be little benefit in expounding on the question at length, given the fact that the Second Circuit has already surveyed the issue in great detail and found no ready answer. Instead, I will simply state that I find that the Attorney General is a proper respondent in this action for the reasons stated by Judge Weinstein in *Mojica v. Reno,* 970 F.Supp. 130, 166–67 (E.D.N.Y.1997). I therefore need not decide whether personal jurisdiction would be proper over the INS's district director in Louisiana. *See Mojica,* 970 F.Supp. at 166; *Yesil v. Reno,* 958 F.Supp. 828, 835–36 (S.D.N.Y.1997).

## D. *The Merits of Petitioners' Claims*

### 1. *Pena–Rosario*

Pena–Rosario is entitled to habeas relief whether or not AEDPA and IIRIRA are construed to apply to aliens whose criminal convictions predated the statutory changes. Because the INS served him with an order to show cause on August 5, 1994, his case was "pending" upon enactment of the 1996 amendments. Since the Second Circuit has held that Congress did not intend those changes to apply to pending cases, *see Henderson,* 157 F.3d at 129, Pena–Rosario is entitled to seek § 212(c) relief from the Attorney General.

In its cursory response to this argument,[10] the Government points to an INS

---

9. The government does not challenge personal jurisdiction in the other cases.

10. Inexplicably, the Government's brief addresses Pena–Rosario's argument on this point only in a footnote. (Corrected Memorandum of Law in Opposition to Petition for a

regulation that specifies that "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service." 8 C.F.R. § 3.14 (1999). Since the Pena–Rosario's notice to appear was not filed with the Immigration Court until June 19, 1997, after enactment of the 1996 amendments, the Government contends that Pena–Rosario's removal proceeding was not "pending" until then.

In a recent case presenting this identical issue, the First Circuit rejected the Government's position:

> In this case we are not concerned with the INS's internal time tables, starting points, due dates, and the like but with the judicial question of retroactivity. This question turns on considerations unrelated to the purpose of the INS regulations—primarily (in the absence of statutory guidance) with the evil Congress sought to prevent and the realities of reasonable reliance or settled expectations on the part of litigants. From this standpoint, we think that when an order to show cause is served on the alien, the deportation process has effectively begun and expectations properly form, even if there is no actual reliance.

*Wallace v. Reno,* 194 F.3d 279, 287 (1st Cir.1999); *accord Canela v. U.S. Dep't of Justice,* 64 F.Supp.2d 456, 458 (E.D.Pa. 1999); *Dunbar v. INS,* 64 F.Supp.2d 47, 52 (D.Conn.1999); *Mercado–Amador v. Reno,* 47 F.Supp.2d 1219, 1224 (D.Or.1999).

I find these cases persuasive, and I adopt their reasoning. Since Pena–Rosario was served with an order to show cause before enactment of the 1996 amendments, his case was pending then. Those statutory changes therefore do not apply to him, and he is entitled to seek a discretionary waiver from the Attorney General. *See Henderson,* 157 F.3d at 129.

In addition, Pena–Rosario, like the other petitioners, prevails for the reasons discussed below.

### 2. *All Petitioners*

The parties differ as to whether the provisions of AEDPA and IIRIRA rendering certain aliens ineligible for discretionary waivers from deportation apply to aliens whose criminal activity occurred before enactment of those statutes. Although *Henderson* decided that the repeal of discretionary authority did not apply to cases pending upon the date of AEDPA's enactment, it left the question presented by these petitions open. *See Henderson,* 157 F.3d at 128 n. 28. I conclude that the provisions do not apply and that each of these petitioners is therefore eligible to pursue § 212(c) waivers of deportation.

The obvious starting point for this analysis is the text of the relevant statutes. *See Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach."); *id.* at 263, 114 S.Ct. 1483 (discussing search for "unambiguous directive" on question of retrospective application); *Martin v. Hadix,* 527 U.S. 343, 119 S.Ct. 1998, 2003, 144 L.Ed.2d 347 (1999). Unsurprisingly, the petitioners contend that the statutes answer the question in their favor, while the government argues just the opposite.

Petitioners point to a number of provisions in AEDPA and IIRIRA that are written explicitly to be retrospective. *See, e.g.,* IIRIRA § 321(c) (amending the definition of aggravated felon and stating "the term applies regardless of whether the conviction was entered before, on, or after the date of enactment of this paragraph"); AEDPA § 413(g) (making alien terrorists ineligible for certain types of relief from

---

Writ of Habeas Corpus, at 27 n. 6.) Moreover, the Government does not cite, much less distinguish, any of the case law addressing this

question, all of which squarely supports Pena–Rosario's position.

deportation and stating that the prohibition "shall take effect on the date of the enactment of this Act and shall apply to all applications filed before, on, or after such date if final action has not been taken on them before such date"). By negative inference, they contend that IIRIRA § 304(b) and AEDPA § 440(d), the provisions ending discretionary waivers for aggravated felons, reflect Congress's intent that they be applied only to those whose criminal activity occurred after enactment of the statutes. This is similar to the analytical approach taken by the Second Circuit in *Henderson,* which the petitioners contend is instructive here.

The government on the other hand contends that IIRIRA includes a clear statement of Congress's intent in the opposite direction. It points to the effective date provision of the statute, which states that except for certain enumerated provisions, "this subtitle and the amendments made by this subtitle shall take effect on the first day of the first month beginning more than 180 days after the date of the enactment of this Act." IIRIRA § 309(a). The government argues that the provision repealing discretionary waiver authority could not become effective on that date, as § 309(a) seemingly requires, if it applies only to criminal conduct occurring afterwards.

I find neither argument convincing. In my view, Congress's intent regarding the retrospective application of the relevant provisions is unclear. The government puts too much weight on Section 309(a), which is nothing more than a typical effective date provision. The Supreme Court has clearly stated that a "statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date." *Landgraf,* 511 U.S. at 257, 114 S.Ct. 1483.

The government's reliance on *Buitrago–Cuesta v. INS,* 7 F.3d 291 (2d Cir.1993), in further support of its argument is misplaced. In that case, the Second Circuit held that § 511 of the Immigration Act of 1990, which precluded aggravated felons who had served at least five years in prison from applying for discretionary waivers, applied retrospectively. *See id.* at 295. This holding was based on an analysis of the language and structure of the 1990 Act; as such, it has no bearing on the language and structure of AEDPA and IIRIRA. *Buitrago–Cuesta* also preceded the Supreme Court's decision in *Landgraf,* so it obviously did not apply the currently-required test for questions of retrospective application. The best proof of *Buitrago–Cuesta*'s inapplicability is the fact that it held that § 511 applied to a *pending* case. *See id.* at 293 (noting that INS commenced deportation proceedings against petitioner on November 16, 1988); *id.* at 292 (noting that provision barring him from discretionary relief passed in 1990); *id.* at 295 (holding that provision applied to petitioner). If the government is correct that *Buitrago–Cuesta* applies to questions of retrospective application of AEDPA and IIRIRA, then that case squarely contradicts *Henderson.* Yet *Henderson* does not even cite to *Buitrago–Cuesta;* the panel must have concluded that it was not relevant.

The petitioners' negative inference argument, which largely relies on *Henderson,* is likewise not compelling for several reasons. *But see Pottinger v. Reno,* 51 F.Supp.2d 349, 359–61 (E.D.N.Y.1999) (finding *Henderson*'s analytical approach instructive). First, the government's argument in this case rests principally on the language and structure of IIRIRA, which *Henderson* did not address. IIRIRA replaced entirely the statutory framework regarding discretionary waivers that AEDPA had only amended. Especially given the hurried way that these statutes appear to have been enacted, it is at least possible that they could reflect disparate Congressional intents regarding retrospective application of the restrictions on discretionary waivers. Second, *Henderson* rested its negative inference argument on AEDPA § 413(g), which required that the alien

terrorist provision to which it referred be applied to pending cases, and on the fact that the conference committee reconciling the two versions of the bill omitted a provision from the Senate version that would have explicitly applied the restrictions on discretionary waivers for criminal aliens to pending cases. *See Henderson,* 157 F.3d at 129–30. These provisions are clearly concerned with the result in *pending* cases. The opposite of such provisions—and thus the result of the negative inference—is that Congress did not intend its restrictions on discretionary waivers to apply to *pending* cases. It would stretch the negative inference beyond its logical breaking point, however, to say that the absence of these provisions also clearly reflected Congress's intent not to apply its restrictions to aliens whose criminal conduct predated the statute. That inquiry is on a different plane from the simpler question of pending cases. Finally, there are provisions of AEDPA that could be read to create a negative inference adverse to petitioners' position. *See, e.g.,* AEDPA § 440(f) (making changes to definition of aggravated felony "apply to convictions entered on or after the date of the enactment of this Act"), *cited in Requena–Rodriguez v. Pasquarell,* 190 F.3d 299, 307 (5th Cir. 1999).

I do not mean to suggest that the parties' respective positions are meritless; both have some force and have prevailed in some courts. *Compare DeSousa,* 190 F.3d at 186–87 ("[T]raditional rules of statutory construction suggest that pre-AEDPA convictions are to be considered in denying waivers....") *with Maria,* 68 F.Supp.2d at 228 ("Congress did not design [AEDPA] section 440(d) to be applied in a way that

would change the consequences of past conduct."). In my view, the conflicting evidence means only that Congress's intent on this question is not clear. *Accord Requena–Rodriguez,* 190 F.3d at 307–08; *Jurado–Gutierrez v. Greene,* 190 F.3d 1135, 1150 (10th Cir.1999); *Asad v. Reno,* 67 F.Supp.2d 886, 890 (M.D.Tenn.1999).

■ Accordingly, the analysis must proceed to the next step in the *Landgraf* inquiry: "whether the application of the statute to the conduct at issue would result in a retroactive effect,"[11] *Martin,* 119 S.Ct. at 2003; *see also Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483. A statute will not be said to have a retroactive effect "merely because it is applied in a case arising from conduct antedating the statute's enactment" or because it "upsets expectations based on prior law." *Landgraf,* 511 U.S. at 269, 114 S.Ct. 1483. The test is instead "whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 269–70, 114 S.Ct. 1483; *see also Martin,* 119 S.Ct. at 2006.

■ Applying AEDPA and IIRIRA to aliens whose criminal conduct predated those statutes' enactment meets this definition of retroactive effect. *Accord Dunbar,* 64 F.Supp.2d at 53; *Maria,* 68 F.Supp.2d at 230. Prior to enactment of these statutes, commission of certain crimes meant only the possibility of deportation. Afterwards, it means the certainty of deportation. *See Maria,* 68 F.Supp.2d at 230. The replacement of a discretionary regime with a mandatory one is of momentous formal and practical significance. *See id.* ("Converting a maximum

---

11. In this opinion, I have adopted the terminology used by the Third Circuit:

'Retroactive effect' refers not to a statute's temporal reach—which is the ultimate question to be answered in these cases—but to the effect the statute would have if applied retrospectively; i.e., would it reach back in time and alter the rights or obligations on which the parties relied prior to the statute's passage. If so, the statute is

said to have 'retroactive effect' and ... its application to pending cases is disfavored. To minimize confusion, we refer to a statute that applies to [cases involving pre-enactment conduct] as one with 'retrospective' application.

*Mathews v. Kidder, Peabody & Co., Inc.,* 161 F.3d 156, 160 n. 5 (3d Cir.1998), *cert. denied,* ── U.S. ──, 119 S.Ct. 1460, 143 L.Ed.2d 546 (1999).

sentence into a mandatory one ... has a retroactive effect."). New legal consequences (automatic as opposed to possible deportation) have clearly been attached to events completed before the statutory enactments. My conclusion is reinforced by the fact that from fiscal years 1989 and 1994, more than half of all aliens who sought § 212(c) waivers secured them. *See Goncalves v. Reno*, 144 F.3d 110, 128 (1st Cir.1998) (citing *Mojica v. Reno*, 970 F.Supp. 130, 178 (E.D.N.Y.1997)), *cert. denied*, 526 U.S. 1004, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999).

The Second Circuit, albeit in dictum, has indicated that it will come to the same conclusion on the retroactive effect of this change. *See Henderson*, 157 F.3d at 129 ("Application of this presumption would require us to consider whether the statute before us is genuinely retroactive. We are included to believe that it is."); *see also Mayers v. INS*, 175 F.3d 1289, 1303 (11th Cir.1999) ("Prior to the passage of AEDPA, the petitioners had a statutory right to apply for a § 212(c) waiver. To prohibit them from making such an application now arguably 'attaches a new disability' and imposes additional burdens on past conduct.") (quoting *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 948, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997)); *Goncalves*, 144 F.3d at 128 ("The Attorney General's application of the new AEDPA restrictions takes away a form of relief that, while discretionary, is plainly

substantive, and so implicates *Landgraf*'s presumption against retroactivity.").

I disagree with those courts that have placed dispositive weight on the low probability that an alien actually had the discretionary waiver regime in mind when committing his crime. *See, e.g., LaGuerre v. Reno*, 164 F.3d 1035, 1041 (7th Cir.1998), *petition for cert. filed*, 68 U.S.L.W. 3154 (U.S. Sept. 7, 1999) (No. 99–418). Individuals are presumed to act against a backdrop of legal obligations. If they were not, there would be little problem with the retrospective application of many laws; there are likely to be few instances of an individual poring over a statute book before acting. "Whether or not the operative conduct might have been different, the immigrant has a presumptive right to the imposition of only those consequences which could have attached at the time he committed his act." *Maria*, 68 F.Supp.2d at 229.

■ Since applying the statutory bar on discretionary waivers would have a retroactive effect, the "traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483; *see also Martin*, 119 S.Ct. at 2003. For the reasons already discussed, I find no such intent here. Accordingly, I conclude that these petitioners are entitled to pursue discretionary waivers pursuant to pre-AEDPA § 212(c).[12]

12. I obviously make no determination regarding (i) whether any pre-AEDPA statutory bar might preclude these petitioners from the relief they seek or (ii) the ultimate merits of their applications. Since I have concluded that the 1996 amendments do not apply to the petitioners' requests for discretionary waivers, I need not reach their contentions that those provisions are unconstitutional. Trinidad's motion for a default judgment and application for appointment of counsel are denied as moot. His motion to file supplementary evidence showing that his conviction is on appeal is denied as moot. Gjeta's motion for a default judgment is denied as moot.

Vargas additionally contends that he was not convicted of an aggravated felony within

the meaning of INA § 101(a)(43)(P), 8 U.S.C. § 1101(a)(43)(P) (Supp. III 1997). I reject this argument. This provision defines as an aggravated felony "an offense ... which is falsely making, forging, counterfeiting, mutilating, or altering a passport or instrument in violation of section 1543 of Title 18, or is described in section 1546(a) of such title" if the term of imprisonment was at least twelve months. Vargas was convicted (and sentenced to fifteen months) under 18 U.S.C. § 1546(a), which prohibits the knowing forgery, counterfeiting, altering or false making of, *inter alia*, a "document prescribed by statute or regulation ... as evidence of authorized stay or employment in the United States." By Vargas's admission, he was convicted for having "prepared and submitted to

*ORDER*

For the reasons stated herein, I grant writs of habeas corpus as to Pena–Rosario, Vargas, Robinson, Trinidad, and Gjeta. Their removal orders are vacated, and their cases are remanded to the BIA for further proceedings consistent with this opinion.

So Ordered.

INS fraudulently prepared Applications to Register Permanent Residence (INS form I–485) for the purpose of obtaining work authorization for individuals that paid him to do so. The Applications contained false information and fraudulent supporting documents, such as a false marriage license." (Vargas Complaint, ¶ 12.) I conclude that Vargas "falsely ma[de]" an "instrument," namely form I–485, and therefore was properly defined as an aggravated felon under INA § 101(a)(43)(P).